UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ATRON L. WADDY and
ANITA WADDY,

    Plaintiffs,

v.                    407CV075

GLOBUS MEDICAL, INC.

    Defendant.

## ORDER

### I. INTRODUCTION

Plaintiff Atron L. Waddy brings this medical-device, products liability action against Globus Medical, Inc. Atron's[1] doctor had surgically installed a pedicle screw into his back to address persistent back problems. The screw later broke, requiring a repair operation. Doc. # 44. Contending that the screw was defective, Atron wants Globus, its manufacturer, to pay him for his pain and suffering, medical costs, etc., under strict liability, negligence, breach of warranty, and failure to warn theories. Doc. # 26.

Moving for summary judgment against him, Globus insists that the screw's failure has had nothing to do with Atron's condition (hence, he cannot show proximate cause), so this case must be dismissed. Doc. # 37. It also seeks dismissal of wife and co-plaintiff Anita Waddy's loss-of-consortium claim. *Id.* Opposing, doc. # 43, Atron also moves (doc. # 47) for leave to file a supplemental brief -- which is denied as moot because the "parties may file as many reply briefs as they want." *Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 609 (S.D.Ga. 2003); *see also* S.D.GA.LOC.R. 7.6 (authorizing reply briefs but imposing notice requirements and time limits).[2]

### II. BACKGROUND

Plaintiff's back problems trace back to 1998. Doc. # 44 ¶ 1. They became severe enough to qualify him -- years before any of the events giving rise to this litigation -- for 100% disability rating by the Social Security Administration. *Id.* He remains 100% disabled today. *Id.* In 2005, Atron's doctor, Williard D. Thompson, M.D., examined him for chronic back pain and pain down his legs. *Id.* ¶ 3.

Various tests revealed degenerative disc disease at two levels. After consultation with the Waddys, the decision was made to treat both levels up front. *Id.* That involved

---

[1] For simplicity and convenience, the Court will primarily refer only to Atron, and thus "plaintiff" in the singular, since his wife Anita's claim rises and falls with his.

[2] Opposing Atron's otherwise moot motion, Globus complains about sandbagging -- that he basically waited for Globus to show its hand, then opted to present "new" issues and evidence in a supplemental (also called a "reply") brief. Doc. # 48. Sandbagging was the prime justification for the pre-*Podger* regime, under which parties were required to seek leave of Court before they could file a reply brief and parties like Globus could move to strike (block) sandbagging briefs.

Now that reply briefs are welcome any time (subject to the "sudden-death" fact that the Court is free to issue a decision at any time after the initial rounds of briefs), however, no one has an incentive to sandbag or await his adversary's response before showing his real hand -- precisely because each party knows that their opponent shall always be free to reply (indeed, Local Rule 7.6 asks only that the party promptly let the Court know that a reply brief is on the way so that it may decide whether to await it prior to issuing an opinion). Judicial resources are thus conserved: Pre-*Podger*, the Court was constantly confronted by a steady stream of motions for leave to file a supplemental brief, or to block same. Those motions, as well as the sandbagging incentive, are now obsolete.

Finally, and contrary to Globus's contention, doc. # 48 at 3-5, the Court's Scheduling Order (doc. # 16) does *not* prohibit Reply briefs, and neither does F.R.Civ.P. 16.

surgery (lumbar disc fusion)[3] about which Thompson warned Atron of the risks and potential success rate. He estimated that the surgery would possibly yield only a partial improvement and that there also might be no improvement. Thompson's pre-surgery notes reflect his warning that Atron most likely will always have some component of back pain. *Id.* ¶ 4.

Atron acknowledges that Thompson discussed the risks inhering in the proposed surgery, but he denies that Thompson specifically warned him about the possibility of hardware failure. *Id.* ¶ 5; *see also* doc. # 49 at 37. Globus emphasizes Thompson's doctor-patient conference notes, which

> state that the risks that were discussed included, neurological injury, ... infection, spinal fluid leak, no improvement of symptoms and hardware failure. Dr. Thompson further testified that [Atron] understood the risk of *hardware failure* in the type of surgery that was going to be performed on Plaintiff Waddy. Indeed, the risk of hardware failure is a known risk and one that surgeons are aware of.

Doc. # 44 ¶ 5 (cites and emphasis omitted; emphasis added). Again, Atron denies that Thompson discussed any hardware-failure risks with him, only the general surgery risks, doc. # 49 at 37, and Globus (as noted *infra*) pursues no summary judgment on Atron's failure-to-warn claim.

After approximately 3 months following an otherwise medically unremarkable, 2005 surgery, one of the Globus pedicle screws fractured. Doc. # 44 ¶¶ 7, 8. Dr. Clark Deriso, a local orthopedic surgeon (doc. # 44 ¶ 6), opines that this initial surgery "never achieved fusion[,] thereby creating additional undue stress on the screw[,] causing its fracture." *Id.* ¶ 8; *see also* doc. # 51 at 28.

After the fractured screw was discovered, Thompson performed a second surgery and removed all of the hardware from Plaintiff Waddy. Doc. # 44 ¶ 9. Globus emphasizes that this second surgery was done primarily in an effort to create fusion, which had simply not been achieved during the initial surgery on Atron. Doc. # 44 ¶ 9. Atron, in contrast, emphasizes that "the surgery was necessitated by the fracture of the original screw because of concerns that the [screw] fragments could cause further damage to [him]." *Id.*

The parties do agree, however, on this: There is "no medical evidence in the record before this Court that the fracture of the pedicle screw caused or contributed to the *current* symptoms of pain that [Atron] is complaining of." Doc. # 44 ¶ 11 (emphasis added). To that end, Thompson opines: "I do not think that [Atron's] pain was directly caused by the failure of the pedicle screw as the screw was not impinging on a nerve or the fecal sack." *Id.* ¶ 12. Deriso concurs. *Id.* ¶ 13. Atron does not dispute this. *Id.*

For that matter, Deriso opines that Atron's injuries were not caused by the screw's fracture, and that his symptoms are entirely consistent with pain related to and caused by his degenerative disc disease. Nor is there any objective medical evidence to support any contention that Atron's new symptoms of pain have been caused by the fractured screw. *Id.* ¶ 14. Finally, Deriso concludes that the second, screw-removal surgery "was not done to alleviate any of [Atron's] symptoms," but

---

[3] "Fusion is a biological process in which bone grows between the vertebrae to be fused." *Wheat v. Sofamor, S.N.C.*, 46 F.Supp.2d 1351, 1356 n. 3 (N.D.Ga. 1999).

2

instead "to try and obtain a better fusion and create further stabilization." *Id.*

## III. ANALYSIS

Based on the forgoing undisputed facts, Globus contends that it is entitled to summary judgment because there is no expert medical testimony showing that the fracture of the pedicle screw caused or contributed to any of Atron's symptoms. Doc. # 44 at 7-8. It highlights his surgeon's testimony:

> In sum, Dr. Thompson testified he did not have any direct opinion on whether he believed the fracture of the pedicle screw caused the Plaintiff any pain. He further testified that it was his belief that the second surgery was done in an effort to deal with the cage[4] that had migrated; not to deal with the broken screw.

Doc. # 48 at 5 n.1.

Additionally, it contends, Anita's loss-of-consortium claims fail because they are derivative of Atron's.[5] Doc. # 44 at 8.

Atron agrees that surgeons use "cages" and that his surgeon used Globus pedicle screws to try to achieve, as Dr. Deriso stated, "better fusion and create further stabilization." Doc. # 47-2 at 3-4; # 44 ¶ 14. But the second surgery, Atron maintains, "was required to address the failure of the system as a whole and to prevent future failure from occurring." Doc. # 47-2 at 4. So, to the extent that Atron's pain was in part caused by his cage's instability and migration, and that instability and migration was caused by the screw failure, a jury can find that to be a causal factor to at least some of his pain and suffering. *Id.*

Put another way, it matters not that another reason (persistent failure of his back to "fuse") existed to require the second surgery; what matters is that the defective pedicle screws *in part* required that surgery. In that regard, Atron cites Thompson's second-surgery notes. They contain, in the surgeon's findings, mention of a "[s]ignificant amount of scar, broken pedicle screw on the right at S1." Doc. # 43-6, Exh. D at 1. A preoperative scan "showed a broken screw and a migrated cage. I thought there was no choice but to [fix] this." *Id.* at 2.

Thompson thus surgically removed the broken screw. *Id.* This is enough, says plaintiff, for a jury to find the broken screw to be a causal factor in requiring the second surgery and thus in no small part the pain, suffering and expense of that surgery.

Atron also has submitted an expert witness

---

[4] It is unhelpful when attorneys write briefs that presuppose specialized knowledge on the part of their readers. "The Materials Technology Institute" website provides a "cage" explanation that might be helpful here:

> Back pain, originating from degeneration of intervertebral discs, is often alleviated by the insertion of one or more interbody fusion cages. The function of the cage is to restore the height between two adjacent vertebrae. Most commercial cages consist of titanium or a titanium alloy, while polymeric cages, mostly consisting of polyether-etherketone (PEEK), are also in use.

http://www.mate.tue.nl/mate/showabstract.php/4345 (site as of 8/18/08). The Court infers from this that a "cage" is a medical device or concoction used to restore the height between two "fallen" backbones, or vertebrae.

[5] *See Parrish v. Ford Motor Company*, 2008 WL 2944645 at * 3-4 (S.D.Ga. 5/21/08) (unpublished) (analyzing the difference between derivative and non-derivative consortium claims).

opinion[6] -- one that is not *Daubert*-challenged[7] by Globus -- that the screw "fractured due to a design defect, a manufacturing defect, a materials defect or all three types of defect." Doc. # 43-6, Exh. E at 1.

The issue, then, is whether all that is enough to survive summary judgment. Atron's core claim here sounds in strict liability:

> O.C.G.A. § 51-1-11 provides for strict liability against a manufacturer for personal injuries resulting from an unmerchantable product which was not reasonably suited to its intended use. O.C.G.A. § 51-1-11(b). A manufacturer can be held strictly liable for manufacturing defects, marketing/packaging defects and inadvertent design defects only if the plaintiff shows the product sold was "defective."

*Lawson*, 1999 WL 1129677 at * 4; *see also* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 6 (Mar. 2008). Furthermore, with "claims for manufacturing defects, marketing defects and inadvertent design defects, there is no difference between liability based on strict product liability and liability based on negligence." *Lawson*, 1999 WL 1129677 at * 4 n. 5.

Here Atron need only show that Globus placed into the stream of commerce an "unreasonably dangerous" product, with a defect or defective condition, that generally or specifically caused him damage. *Trickett v. Advanced Neuromodulation Systems, Inc.*, 542 F.Supp.2d 1338, 1344-45 (S.D.Ga. 2008); *Lawson*, 1999 WL 1129677 at * 5; *Siharath v. Sandoz Pharms. Co.*, 131 F.Supp.2d 1347, 1352 (N.D.Ga. 1999) ("Plaintiffs must produce evidence that would allow a reasonable jury to find to a reasonable degree of medical certainty that Parlodel® is ... capable of causing stroke"), *aff'd*, 295 F.3d 1194 (11th Cir. 2002); *Wheat*, 46 F.Supp.2d at 1357 ("General causation is the capacity of a product to cause injury"). And for manufacturing defects or inadvertent design defects, Atron need not "specify precisely the nature of the defect. He must show [only] that the device did not operate as intended and this was the proximate cause of his injuries." *Trickett*, 542 F.Supp.2d at 1345.

Globus does not challenge any of these elements, nor the elements on negligence (under which Atron must prove the existence of a duty, breach, causation and injury, *Lawson*, 1999 WL 1129677 at * 5), nor failure to warn (plaintiff must show that Globus had a duty to warn, but breached that duty, and that the breach proximately caused Atron's injury, *id.*).[8]

---

[6] "Expert medical testimony is required to carry a plaintiff's burden of proving causation under Georgia products liability law." *Lawson v. Smith and Nephew Richards, Inc.*, 1999 WL 1129677 at * 2 (N.D.Ga. 9/30/99) (unpublished); *see also* GEORGIA PRODUCTS LIABILITY LAW § 9-3 (*Medical causation*) (Apr. 2008).

[7] *See Wheat*, 46 F.Supp.2d at 1357 (on a *Daubert* challenge, court concluded that spinal surgery patients' expert's testimony was unhelpful and irrelevant in products liability action against manufacturers of bone screw device, since expert could not state to reasonable degree of medical certainty that screws themselves, as opposed to implantation of screws, had caused injuries, either in general or in patients' specific surgeries); *Baker v. Smith and Nephew Richards, Inc.*, 1999 WL 1129650 (N.D.Ga. 9/30/99) (unpublished) (*Dauubert* challenge in product liability actions for injuries allegedly resulting from defective bone screw devices); *Lawson*, 1999 WL 1129677 at * 2 (*Daubert* challenge in Spinal Rod System product defect case).

[8] Nor does Globus raise a learned-intermediary doctrine defense in its summary judgment motion. *See generally,* Ann., *Construction and application of learned-intermediary doctrine*, 57 A.L.R.5th 1 (1998)

4

Instead, Globus focuses solely on the lack of causation, as discussed above. Atron, whose experts' inability to determine a specific defect in the bone screw is not fatal to Atron's claims, *Trickett*, 542 F.Supp.2d at 1345, need only present *some* causation evidence:

> Where a plaintiff presents admissible expert testimony regarding general and specific causation,[9] the questions of fact regarding causation should be resolved by the jury. Where admissible medical causation evidence is not presented, however, the court should grant summary judgment for the defendants.

GEORGIA PRODUCTS LIABILITY LAW § 9-3

---

(this doctrine "provides that the manufacturer or supplier of a prescription drug has no legal duty to warn a consumer of the dangerous propensities of its drug, as long as adequate warnings are provided to the prescribing physician. The doctrine has been extended to encompass medical devices and equipment that can be sold only through a physician or a physician's prescription").

[9] This encyclopedist -- focusing on medical toxins as opposed to medical devices -- summarized the degree and extent to which plaintiffs like Atron must prove causation:

> Georgia law recognizes that, in order to establish a cause and effect relationship, a plaintiff must first offer proof of general causation: whether exposure to a substance is capable of causing a particular injury or disease. In addition, a plaintiff must also produce evidence of specific causation: whether exposure to a substance under the circumstances of the case caused a particular plaintiff's illness or disease. Both analyses involve a question of the concentration levels or dose of the toxin to which a plaintiff was exposed. Nevertheless, a plaintiff need not demonstrate the dose to which he was exposed with mathematical certainty.

*Id.* (footnotes omitted).

(footnote added and omitted). On causation Atron has presented his own surgeon's notes showing that the second surgery was in part necessitated by the defective screw. He need not show causation (*i.e.*, that the defective screw at least in part caused the need for the second surgery) with mathematical certainty, *see supra* n. 9, and "under Georgia law there may be more than one proximate cause of an injury." GEORGIA PRODUCTS LIABILITY LAW § 9-4 (citing *Pearson v. Tippmann Pneumatics, Inc.*, 281 Ga. 740 (2007)). As for damages, it is indisputable that surgery is expensive, stressful, and something that any normal person would seek to avoid. Likewise, most feel some quantum of post-op pain and suffering.

Combined, this is enough to defeat Globus's motion for summary judgment. Atron has cited sufficient evidence to require a jury to resolve the extent that Atron's pre-second-surgery pain was in part caused by his back cage's instability and migration, and whether that instability and migration was at least in part caused by the Globus screw's failure. He may recover for that period's pain and suffering that a jury finds traceable to the pedicle screw's failure.

Note that Globus has thus pared Atron's case down to a damages claim for his pain and suffering (and medical expenses) from the point that its pedicle screw failed until it was removed during the second surgery (*i.e.*, there is now no dispute that any post-second-surgery pain is *not* attributable to the screw's failure). His wife's consortium claim is thus correspondingly affected.

The Court thus grants and denies in part Globus's summary judgment motion. Atron's pain and suffering claim, as clarified here, shall go to trial, along with his wife's consortium claim. The parties must now file, within 30 days of the date this Order is served, a

Consolidated Pretrial Order. They will try this case shortly thereafter.

## III. **CONCLUSION**

Accordingly, the Court **_GRANTS_** in part and **_DENIES_** in part defendant Globus Medical, Inc.'s motion for summary judgment (doc. # 37) against plaintiffs Atron L. and Anita Waddy. Plaintiffs' motion (doc. # 47) for leave to file a supplemental brief is **_DENIED_** as moot.

This  18  day of August, 2008.

_/s/ B. Avant Edenfield_
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA